Susan Martin (AZ#014226)
Jennifer Kroll (AZ#019859)
Martin & Bonnett, P.L.L.C.
4647 N. 32nd Street, Suite 185
Phoenix, Arizona 85018
Tel: (602) 240-6900
smartin@martinbonnett.com
jkroll@martinbonnett.com

***Attorneys for Plaintiff***

***(Additional Counsel listed below)***

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| George Leboeuf, Derivatively on Behalf of AMMO, Inc., <br><br> Plaintiff, <br><br> v. <br><br> Fred W. Wagenhals; Jared R. Smith; Robert D. Wiley; Russell William Wallace, Jr.; Richard Childress; Jessica Lockett; Steve F. Urvan; Christos Tsentas; Wayne Walker; Randy Luth; Robert J. Goodmanson; and Harry Markley, <br><br> Defendants, <br><br> and, <br><br> AMMO, Inc., <br><br> Nominal Defendant. | Case No: <br><br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff George LeBoeuf ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of AMMO, Inc., ("AMMO" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from August 19, 2020 through the present (the "Relevant Period") and have caused substantial harm to the Company.

## JURISDICTION

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934. This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

3.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a

substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

5.     In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**THE PARTIES**

**Plaintiff**

6.     Plaintiff is, and was at relevant times, a shareholder of the Company. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

7.     **Nominal Defendant AMMO** is incorporated under the laws of Delaware with its principal executive offices located in Scottsdale, Arizona.  AMMO's common stock trades on the NASDAQ exchange under the symbol "POWW."

**Director Defendants**

8.     **Defendant Russell William Wallace, Jr.** ("Wallace") has been a director of the Company at all relevant times since June 2017.  He also serves as a member of the Audit Committee.

9.     **Defendant Richard Childress** ("Childress") has been a director of the Company at all relevant times since January 2021.  He also serves as a member of the Audit Committee.

10. ***Defendant Jessica Lockett*** ("Lockett") has been a director of the Company at all relevant times since December 2020. She also serves as the Chair of the Audit Committee.

11. ***Defendant Steve F. Urvan*** ("Urvan") has been a director of the Company at all relevant times since April 2021. Defendant Urvan was employed by the Company from April 2021 through January 5, 2023 as Chief Strategy Officer.

12. ***Defendant Christos Tsentas*** ("Tsentas") has been a director of the Company at all relevant times since November 2022.

13. ***Defendant Wayne Walker*** ("Walker") has been a director of the Company at all relevant times since November 2022.

14. ***Defendant Randy Luth*** ("Luth") has been a director of the Company at all relevant times since January 2023.

15. ***Defendant Robert J. Goodmanson*** ("Goodmanson") served as a director and President of the Company from October 2019 through to December 2022.

16. ***Defendant Harry Markley*** ("Markley") served as a director from April 2018 through to July 2023.

17. The above-named defendants are collectively referred to herein as the "Director Defendants."[1]

**<u>Officer Defendants</u>**

18. ***Defendant Fred W. Wagenhals*** ("Wagenhals") was the Company's Founder and Chief Executive Officer ("CEO") from 2016 until July 24, 2023. As a result of the wrongdoing alleged herein, Defendant Wagenhals is a named defendant in the factually related Securities Class Action (defined below).

19. ***Defendant Jared R. Smith*** ("Smith") has been the Company's Chief Executive Officer ("CEO") since July 24, 2023. As a result of the wrongdoing alleged

---

[1] References to "Director Defendants" in the demand futility section of this Complaint do not refer to Defendants Goodmanson and Markley.

herein, Defendant Smith is a named defendant in the factually related Securities Class Action.

20. ***Defendant Robert D. Wiley*** ("Wiley") was the Company's Chief Financial Officer ("CFO") at all relevant times. As a result of the wrongdoing alleged herein, Defendant Wiley is a named defendant in the factually related Securities Class Action.

21. The above-named defendants are collectively referred to herein as the "Officer Defendants."

22. The Director Defendants and Officer Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

23. AMMO designs, produces, and markets ammunition and ammunition component products for public consumers, manufacturers, and law enforcement and military agencies.

## MATERIIALY FALSE AND MISLEADING STATEMENTS

24. The Relevant Period begins on August 19, 2020.[2] On that day, AMMO submitted its annual report for the fiscal year ended March 31, 2020, on a Form 10-K filed with the SEC (the "2020 Annual Report"), which was signed by Defendants Wagenhals, Goodmanson, Wallace, Luth, and Markley. The 2020 Annual Report relayed the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the 2020 Annual Report stated in relevant part:

///

///

///

_____

[2]     Unless otherwise stated, all emphasis in bold and italics hereinafter is added.

## ITEM 11 EXECUTIVE COMPENSATION

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals President, Chief Executive Officer, and Director | 3/31/2020 | $ 120,000 | $ 0 | $ 180,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 300,000 |
| | 3/31/2019 | $ 120,000 | $ 0 | $ 156,375 | $ 0 | $ 0 | $ 0 | $ 0 | $ 276,375 |
| Steve Hilko (4) Chief Operating Officer | 3/31/2020 | $ 120,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 120,000 |
| | 3/31/2019 | $ 120,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 120,000 |
| Robert D. Wiley(5) Chief Financial Officer | 3/31/2020 | $ 103,333 | $ 0 | $ 86,794 | $ 0 | $ 0 | $ 0 | $ 0 | $ 190,127 |
| | 3/31/2019 | $ 77,917 | $ 0 | $ 76,395 | $ 0 | $ 0 | $ 0 | $ 0 | $ 154,312 |

## Director Compensation

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Robert J. Goodmanson (4) | $ 0 | $ 80,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 80,000 |
| Russell William Wallace Jr. | $ 0 | $ 80,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 80,000 |
| Randy Luth | $ 0 | $ 80,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 80,000 |
| Harry Markley | $ 0 | $ 80,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 80,000 |
| Dan O'Connor (5) | $ 0 | $ 90,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 90,000 |
| Tom Jagemann (6) | $ 0 | $ 20,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 20,000 |

| | For the Year Ended | |
|---|---|---|
| | March 31, 2020 | March 31, 2019 |
| Net Sales | $ 14,780,365 | $ 4,565,652 |
| Cost of Products Sold | 18,455,904 | 4,795,346 |
| Gross Margin | (3,675,539) | (229,694) |
| Sales, General & Administrative Expenses | 10,161,954 | 8,750,964 |
| Loss from Operations | (13,837,493) | (8,980,658) |
| Other income (expense) | | |
| Other income (expense) | (719,187) | (2,728,754) |
| Loss before provision for income taxes | $ (14,556,680) | $ (11,709,412) |
| Provision for income taxes | | - |
| Net Loss | $ (14,556,680) | $ (11,709,412) |

25.    The 2020 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2020 Annual Report stated in relevant part:

\* \* \*

**Financing Activities**

We financed our operations primarily from the issuance of equity instruments. During the year ended March 31, 2020, net cash provided by financing activities was $4,524,848. This was the net effect of $2,465,540

generated from the sale of Common Stock, *net of cash payments of $285,981 in conjunction with the Unit offerings.* We issued $2,500,000 in Convertible Promissory Notes*, net of $329,000 of issuance costs.* Additionally, $9,747,281 was generated from accounts receivable factoring, which was offset by *payments of $7,741,302*. There was $819,731 of cash was generated from the issuance of a related party note payable, These increases to our financing activities were offset by *payment of $1,885,000 on the related party notes payable*, $466,421 toward our insurance premium note payable and a $300,000 payment of our Contingent Consideration Payable.

26.     The 2020 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2020, *we did not have any off-balance sheet arrangements* that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources

27.     The 2020 Annual Report purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2020 Annual Report further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2020 Annual Report stated in relevant part:

**Related Party Transactions**

From October 2016 through December 2018, our executive offices were located in Scottsdale, Arizona where we leased approximately 5,000 square feet under a month-to-month triple net lease for $3,800 per month. This space housed our principal executive, administration, and marketing functions. Our Chairman, President, and Chief Executive Officer owned the building in which these offices are currently leased. For the year ended March 31, 2020 and 2019, the Company paid $21,800 and $53,013, respectively in rent for these offices.

During the year ended March 31, 2020, we paid $184,575 in service fees to an independent contractor, $6,500 in consulting fees to our Previous Chief Financial Officer, and 60,000 shares in the aggregate to its Advisory Committee members for service for a total value of $113,000. Additionally, at March 31, 2020, the Company had a receivable of approximately, $14,700 from its previous Chief Financial Officer. During the year ended March 31, 2019, we paid approximately $168,000 in consulting fees.

In connection with the acquisition of the casing division of Jagemann Stamping Company, a promissory note was executed. The promissory note, under which $500,000 was paid on March 25, 2019 using funds raised for the acquisition, had a remaining balance at March 31, 2019 of $9,900,000. On April 30, 2019, the original due date of the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly until October 1, 2019 when the interest rate increases to 9% per annum payable monthly until principal and accrued interest are paid in full. In May of 2019, the Company paid $1,500,000 on the balance of the note. As of March 31, 2020 and March 31, 2019, we accrued interest of $352,157 and $22,196, respectively, related to the note.

In October of 2019, it was made apparent that certain equipment that was agreed to be delivered free and clear by the Seller was not achievable as Seller was not able to purchase equipment that Seller had leased. Accordingly, the remaining value of the promissory note was reduced by $2,596,200. As a result of the change to the purchase price of the transaction, the Company reduced Equipment for a net value of $1,871,306, decreased Other Intangible Assets by $766,068, increased Accounts Receivable by $31,924, and recorded an increase to Deposits for $9,250 worth of equipment that the Company agreed to transfer back to Seller. Consequently, accumulated amortization has decreased by $159,530.

Additionally, the Company entered into a lease to gain possession of the assets that were originally to be transferred. Subsequent to March 31, 2020, the Company, Enlight and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020. Pursuant to the Settlement Agreement, the Company shall pay JSC $1,269,977 and shall provide JSC with: (i) two new promissory notes, a note of $5,803,800 related to the Seller Note and note of $2,635,797 for inventory and services, both with a maturity date of August 15, 2021, (ii) general business security agreements granting JSC a security interest in all personal property of the Company. Pursuant to the Notes, the Company is obligated to make monthly payments totaling $204,295 to JSC. In addition, the Notes have a mandatory prepayment provision that comes into effect if

the Company conducts a publicly registered offering. Pursuant to such provision, the Company: (a) upon the closing of an Offering of less than $10,000,000 would be obligated to pay the lesser of ninety percent (90%) of the Offering proceeds or seventy (70%) of the then aggregate outstanding balance of the Notes; and (b) upon the closing of an Offering of more than $10,000,000 would be obligated to pay one hundred percent (100%) of the then aggregate outstanding balance of the Notes. The Company was granted an option to repurchase up to 1,000,000 of the shares of the Company's common stock issued to JSC under the Amended APA at a price of $1.50 per share through April 1, 2021 so long as there are no defaults under the Settlement Agreement.

Through the Administrative and Management Services Agreement the Company with Jagemann Stamping Company, the Company purchased approximately $1.9M in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others, for the year ended March 31, 2020.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $278,195. The note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $315,000 in principal payments in the year ended March 31, 2020. We have accrued interest on the note of $9,080. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020 and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the balance at March 31, 2020 was $156,536 and the amended maturity date is September 18, 2020. The Company made $70,000 in principal payments in the year ended March 31, 2020. The amended note bears interest at 1.25% per month. We have accrued interest on the note of $1,287. Subsequent to March 31, 2020, the related party note and accrued interest was paid in full.

Other than the foregoing, none of the directors or executive officers of the Company, nor any person who owned of record or was known to own beneficially more than 5% of the Company's outstanding shares of its Common Stock, nor any associate or affiliate of such persons or companies, has any material interest, direct or indirect, in any transaction that has

occurred during the past fiscal year, or in any proposed transaction, which has materially affected or will affect the Company.

With regard to any future related party transaction, we plan to fully disclose any and all related party transactions in the following manner:

- Disclosing such transactions in reports where required;
- Disclosing in any and all filings with the SEC, where required;
- Obtaining disinterested directors consent; and
- Obtaining shareholder consent where required

28.    On June 29, 2021, AMMO submitted its annual report for the fiscal year ended March 31, 2021, on a Form 10-K filed with the SEC (the "2021 Annual Report"), signed by Defendants Wagenhals, Wiley, Goodmanson, Wallace, Childress, Markley, Lockett, and Urvan.  The 2021 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the 2021 Annual Report stated in relevant part:

## ITEM 11 EXECUTIVE COMPENSATION

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals President, Chief Executive Officer, and Director | 3/31/2021 | $240,000 | $96,004 | $157,500 | $ 0 | $ 0 | $ 0 | $ 0 | $493,504 |
| | 3/31/2020 | $120,000 | $ 0 | $180,000 | $ 0 | $ 0 | $ 0 | $ 0 | $300,000 |
| Steve Hilko Chief Operating Officer(4) | 3/31/2021 | $163,542 | $ 0 | $ 58,333 | $ 0 | $ 0 | $ 0 | $ 0 | $221,875 |
| | 3/31/2020 | $120,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $ 0 | $120,000 |
| Robert D. Wiley Chief Financial Officer | 3/31/2021 | $127,500 | $ 0 | $ 90,977 | $ 0 | $ 0 | $ 0 | $ 0 | $218,477 |
| | 3/31/2020 | $103,333 | $ 0 | $ 86,794 | $ 0 | $ 0 | $ 0 | $ 0 | $190,127 |

## Director Compensation

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $ 70,000 | $ - | $ - | $ - | $ - | $ 70,000 |
| Harry Markley | $ 0 | $ 70,000 | $ - | $ - | $ - | $ - | $ 70,000 |
| Robert J. Goodmanson | $ 90,400 | $ 70,000 | $ - | $ - | $ - | $ - | $160,400 |
| Jessica M. Lockett (4) | $ 12,000 | $ 17,500 | $ - | $ - | $ - | $ - | $ 29,500 |
| Richard R. Childress (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Randy E. Luth (6) | $ 0 | $ 52,500 | $ 0 | $ 0 | $ 0 | $ 0 | $ 52,500 |

29.     The 2021 Annual Report stated the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2021 Annual Report stated in relevant part:

| | | For the Year Ended | |
| --- | --- | --- | --- |
| | | **March 31, 2021** | **March 31, 2020** |
| Net Sales | $ | 62,482,330 | $ 14,780,365 |
| Cost of Products Sold | | 51,095,679 | 18,455,904 |
| Gross Margin | | 11,386,651 | (3,675,539) |
| Sales, General & Administrative Expenses | | 16,766,636 | 10,161,954 |
| Loss from Operations | | (5,379,985) | (13,837,493) |
| Other income (expense) | | | |
| Other income (expense) | | (2,432,309) | (719,187) |
| Loss before provision for income taxes | $ | (7,812,294) | $ (14,556,680) |
| Provision for income taxes | | - | - |
| Net Loss | $ | (7,812,294) | $ (14,556,680) |

### *Financing Activities*

We financed our operations primarily from the issuance of equity instruments. During the year ended March 31, 2021, net cash provided by financing activities was $139,276,235. This was the net effect of $138,612,619 generated from the sale of Common Stock, net of cash payments of $13,895,069 in conjunction with Common Stock offerings. Additionally, $40,309,292 was generated from accounts receivable factoring, which was *offset by payments of $40,473,083*. There was $3,500,000 of cash generated from the issuance of a related party note payable. These increases to our financing activities were *offset by payment of $8,783,410* on the related party notes payable, $514,746 toward our insurance premium note payable and a $1,500,000 payment on the repurchase and cancellation of 1,000,000 shares of our Common Stock.

During the year ended March 31, 2020, net cash provided by financing activities was $4,524,848. This was the net effect of $2,465,540 generated from the sale of Common Stock, net of cash payments of $285,981 in conjunction with the Unit offerings. We issued $2,500,000 in Convertible Promissory Notes, net of $329,000 of issuance costs. Additionally, $9,747,281 was generated from accounts receivable factoring, which was *offset by payments of $7,741,302.* There was $819,731 of cash was generated from the issuance of a related party note payable. These increases to our financing activities were *offset by payment of $1,885,000* on the related party notes payable, $466,421 toward our insurance premium note payable and a $300,000 payment of our Contingent Consideration Payable.

30.     The 2021 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2021, ***we did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources.

31.     The 2021 Annual Report purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past fiscal year." The 2021 Annual Report further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2021 Annual Report stated the following, in relevant part, excluding the previously reported disclosures:

***Related Party Transactions***

During the year ended March 31, 2021, we paid $152,549 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $103,000.

\* \* \*

In connection with the acquisition of the casing division of JSC, a promissory note was executed. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. As of March 31, 2020, we accrued interest of $352,157 related to the note. The note had a balance of $5,400,000 at March 31, 2020 and the note was paid in full on November 5, 2020.

\* \* \*

- 11 -

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021. For the year ended March 31, 2021, the Company purchased approximately $1.9 million in Inventory, incurred $394,128 of rent expenses, and incurred $153,604 of expenses related to support costs such as engineering and maintenance, among others.

On June 26, 2021, the Company and JSC entered into a Settlement Agreement pursuant to which the parties mutually agreed to settle all disputes and mutually release each other from liabilities related to the Amended APA occurring prior to June 26, 2020.

* * *

On November 5, 2020, the Company paid $6,000,000 to JSC allocated as follows: (i) payment in full of Note A, representing the balance due from the Company to JSC relating to the acquisition of Jagemann Munition Components in March 2019 and (ii) $592,982 remitted in partial payment of Note B, resulting in the parties' execution of Amended Note B which has a starting principal balance of $1,687,664 ("Amended Note B"). The Amended Note B principal balance carries a 9% per annum interest rate and is amortized equally over the thirty six (36) month term. As a result of the payment in full of Note A JSC shall release the accompanying security interest in Company assets which secured Note A. Concurrently, upon entry into Amended Note B, JSC and the Company entered into the First Amendment to General Business Security Agreement to reflect a revised list of collateral in which JSC has a security interest. The total interest expense recognized on Note A $216,160 for the year ended March 31, 2021. The total interest expense recognized on the original Note B was $62,876 for the year ended March 31, 2021.

The Company's balance of Amended Note B was $1,490,918 at March 31, 2021. The Company recognized $60,100 in interest expense on Amended Note B for the year ended March 31, 2021.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Common Stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA and subsequently cancelled the total purchased shares.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company

made $18,195 in principal payments during year ended March 2021 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

In December of 2019, the Company entered into a Promissory Note of $90,000 with Fred Wagenhals, the Company's Chief Executive Officer and Chairman of the Board of Directors. The Note originally matured on June 12, 2020, and had an interest rate at the applicable LIBOR Rate. The promissory note has since been amended and the amended maturity date is September 18, 2020. The Company made $25,000 in principal payments during the year ended March 31, 2021, and the Note was paid in full in July of 2020. The amended note bears interest at 1.25% per month. We recognized $5,350 of interest expense on the note for the year ended March 31, 2021.

On September 23, 2020, the Company and Enlight entered into a promissory note (the "Forest Street Note") with Forest Street, LLC ("Lender"), an Arizona limited liability company wholly owned by our current Chief Executive Officer, Fred Wagenhals, for the principal sum of $3.5 million, which accrues interest at 12% per annum. The Note has a maturity date of September 23, 2022.

Pursuant to the terms of the Forest Street Note, the Company and Enlight (collectively, the borrower pursuant to the note) shall pay Lender; (i) on a monthly basis, beginning October 23, 2020, all accrued interest (only), (ii) on a quarterly basis, a monitoring fee of 1% of the principal amount and then accrued interest; and (iii) on the maturity date, the remaining outstanding principal balance of the Loan, together with all unpaid accrued interest thereon.

On December 14, 2020, the Company entered into a Debt Conversion Agreement with the Lender. Pursuant to the Agreement, the Company and Forest Street agreed to convert $2,100,000 of the Note's principal into 1,000,000 shares of the Common Stock. The share issuance occurred on December 15, 2020. As a result of the Debt Conversion Agreement the remaining balance of the Forest Street Note was $1,400,000. On January 14, 2021, the Company paid the remaining $1,400,000 in principal and accrued interest of the Forest Street Note. The Company recognized $137,666 in interest expense related to the Forest Street Note for the year ended March 31, 2021.

\* \* \*

With regard to any future related party transaction, we plan to fully disclose any and all related party transactions in the following manner:

- Disclosing such transactions in reports where required;
- Disclosing in any and all filings with the SEC, where required;
- Obtaining disinterested director consent; and
- Obtaining shareholder consent where required.

32. On June 29, 2022, AMMO submitted its annual report for the fiscal year ended March 31, 2022, on a Form 10-K filed with the SEC (the "2022 Annual Report"), signed by Defendants Wagenhals, Wiley, Goodmanson, Wallace, Childress, Markley, Lockett, and Urvan. The 2022 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals. Specifically, the 2022 Annual Report stated in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

| Name and Principal Position | Period Ended | Salary (1) | Bonus (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|---|---|
| Fred W. Wagenhals Chief Executive Officer, and Director | 3/31/2022 | $298,750 | $572,463 | $481,250 | $ 0 | $ 0 | $ 0 | $ 0 | $1,352,463 |
| | 3/31/2021 | $240,000 | $ 96,004 | $157,500 | $ 0 | $ 0 | $ 0 | $ 0 | $ 493,504 |
| Robert D. Wiley Chief Financial Officer | 3/31/2022 | $217,083 | $ 0 | $350,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 567,083 |
| | 3/31/2021 | $127,500 | $ 0 | $ 90,977 | $ 0 | $ 0 | $ 0 | $ 0 | $ 218,477 |
| Robert J. Goodmanson (4) President | 3/31/2022 | $240,000 | $ 0 | $595,000 | $ 0 | $ 0 | $ 0 | $ 0 | $ 835,000 |
| Steve Hilko Chief Operating Officer(5) | 3/31/2021 | $163,542 | $ 0 | $ 58,333 | $ 0 | $ 0 | $ 0 | $ 0 | $ 221,875 |

**Director Compensation**

| Name and Principal Position | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards (2) | Nonequity incentive plan compensation | Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $140,000 | $ - | $ - | $ - | $ - | $140,000 |
| Harry Markley | $ 0 | $140,000 | $ - | $ - | $ - | $ - | $140,000 |
| Jessica M. Lockett | $ 48,000 | $140,000 | $ - | $ - | $ - | $ - | $188,000 |
| Richard R. Childress | $ - | $140,000 | $ - | $ - | $ - | $ - | $140,000 |
| Steve Urvan (4) | $ - | $105,000 | $ - | $ - | $ - | $ - | $105,000 |

33. The 2022 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2022 Annual Report stated in relevant part:

| | For the Year Ended | |
| --- | --- | --- |
| | March 31, 2022 | March 31, 2021 |
| Net Sales | $ 240,269,166 | $ 62,482,330 |
| Cost of Revenues | 151,505,657 | 51,095,679 |
| Gross Margin | 88,763,509 | 11,386,651 |
| Sales, General & Administrative Expenses | 51,614,147 | 16,766,636 |
| Income (loss) from Operations | 37,149,362 | (5,379,985) |
| Other income (expense) | | |
| Other income (expense) | (615,957) | (2,432,309) |
| Income (loss) before provision for income taxes | $ 36,533,405 | $ (7,812,294) |
| Provision for income taxes | 3,285,969 | - |
| Net Income (Loss) | $ 33,247,436 | $ (7,812,294) |

### *Financing Activities:*

During the year ended March 31, 2022, net cash used in financing activities was approximately $28.2 million. This was the net effect of a $50.0 million payment on debt assumed from Gemini, $35.0 million of proceeds from the sale of our preferred stock net of approximately $3.2 million of issuance costs, approximately $2.5 million of preferred stock dividends paid, approximately $2.2 million of insurance premium note payments, approximately $0.9 million was generated from common stock issued for exercised warrants, the $4.0 million repayment of a note payable, and an approximate $0.3 million reduction in our Inventory Credit Facility. Additionally, approximately $121.5 million was generated from accounts receivable factoring, which was offset by payments of approximately $122.8 million.

34.    The 2022 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2022, ***we did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resource

35.    The 2022 Annual Report purported to disclose the extent of the Company's related party transactions, reporting the following transactions and asserting "[o]ther than the foregoing" "none of the directors or executive officers of the Company," "has any material interest, direct or indirect, in any transaction that has occurred during the past

fiscal year." The 2022 Annual Report further stated that "[w]ith regard to any future related party transaction" the Company "plan[s] to fully disclose any and all related party transactions." Specifically, the 2021 Annual Report stated the following, in relevant part, excluding the previously reported disclosures:

**NOTE 17 – RELATED PARTY TRANSACTIONS**

> During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship.

> \* \* \*

> In connection with the acquisition of the casing division of JSC, a promissory note was executed. On April 30, 2019, the note was subsequently extended to April 1, 2020. The note bears interest per annum at approximately 4.6% payable in arrears monthly. On June 26, 2020, the Company extended the promissory note until August 15, 2021. As of March 31, 2021, we accrued interest of $352,157 related to the note. The was paid in full on November 5, 2020. JSC owned at least five percent (5%) of our shares outstanding from March 2019 through March 16, 2021.

> \* \* \*

> Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

> \* \* \*

> The Company's balance of Amended Note B was $865,771 and $1,490,918 at March 31, 2022 and 2021, respectively. The Company recognized $110,518 and $60,100 in interest expense on Amended Note B for the years ended March 31, 2022 and 2021, respectively.

On January 22, 2021, the Company repurchased 1,000,000 shares of the Company's common stock issued to JSC at a price of $1.50 per share pursuant to the Amended APA.

On May 3, 2019, the Company entered into a promissory note of $375,000 with a shareholder of the Company. The original interest rate was the applicable LIBOR Rate. The promissory note was amended and the note's original a maturity date of August 3, 2019 was extended to September 18, 2020. The amended note bears interest at 1.25% per month. The Company made $18,195 in principal payments during the nine months ended December, 2020 and the Note was paid in full in July of 2020. We recognized $10,327 of interest expenses related to the note during the year ended March 31, 2021.

36.    On June 14, 2023, AMMO submitted its annual report for the fiscal year ended March 31, 2023, on a Form 10-K filed with the SEC (the "2023 Annual Report"), signed by Defendants Wagenhals, Wiley, Wallace, Childress, Markley, Lockett, Walker, Tstentas, and Luth. The 2023 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2023 Annual Report stated in relevant part:

| | For the Year Ended | |
| --- | --- | --- |
| | March 31, 2023 | March 31, 2022 |
| Net Sales | $    191,439,801 | $    240,269,166 |
| Cost of Revenues | 136,031,204 | 151,505,657 |
| Gross Margin | 55,408,597 | 88,763,509 |
| Sales, General & Administrative Expenses | 58,667,516 | 51,614,147 |
| Income (loss) from Operations | (3,258,919) | 37,149,362 |
| Other income (expense) | | |
| Other income (expense) | (606,881) | (615,957) |
| Income (loss) before provision for income taxes | $    (3,865,800) | $    36,533,405 |
| Provision for income taxes | 730,238 | 3,285,969 |
| Net Income (Loss) | $    (4,596,038) | $    33,247,436 |

***Financing Activities***

During the year ended March 31, 2023, net cash used in financing activities was approximately $6.7 million. This was the result of approximately $3.0 million of preferred stock dividends paid, $2.1 million of insurance premium note payments, $0.7 million in payments of our related party note payable, and an approximate $0.8 million reduction in our Inventory Credit Facility. These items were offset by $1.0 million generated from our construction note payable and $0.1 million of proceeds from warrants exercised for common

stock. Additionally, approximately $71.3 million was generated from accounts receivable factoring, which was *offset by payments of approximately $72.3 million*.

During the year ended March 31, 2022, net cash used in financing activities was approximately $28.2 million. This was the net effect of a $50.0 million payment on debt assumed from Gemini, $35.0 million of proceeds from the sale of our preferred stock net of approximately $3.2 million of issuance costs, approximately $2.5 million of preferred stock dividends paid, approximately $2.2 million of insurance premium note payments, approximately $0.9 million was generated from common stock issued for exercised warrants, the $4.0 million repayment of a note payable, and an approximate $0.3 million reduction in our Inventory Credit Facility. Additionally, approximately $121.5 million was generated from accounts receivable factoring, which was offset by *payments of approximately $122.8 million*.

37.     The 2023 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2023, *we did not have any off-balance sheet arrangements* that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources

38.     The 2023 Annual Report stated the following, in relevant part, regarding the Company's purported related party transactions, excluding the previously reported disclosures:

**NOTE 16 – RELATED PARTY TRANSACTIONS**

On November 3, 2022, AMMO, Inc. (the "Company") entered into a Settlement Agreement (the "Settlement Agreement") with Steven F. Urvan and Susan T. Lokey (collectively with each of their respective affiliates and associates, the "Urvan Group").

Pursuant to the Settlement Agreement, the Urvan Group has agreed to withdraw its notice of stockholder nomination of its seven director candidates (the "Urvan Candidates") and its demand to inspect books and records, pursuant to Section 220 of the General Corporation Law of the State of Delaware, and the Company agreed to immediately increase the size of

the Board from seven to nine directors and appoint Christos Tsentas and Wayne Walker (each, a "New Director" and the New Directors together with Mr. Urvan, the "Urvan Group Directors") to the Board to serve as directors with terms expiring at the 2022 annual meeting of stockholders (the "2022 Annual Meeting"). The Company will include the Urvan Group Directors in its director candidates slate for the 2022 Annual Meeting and any subsequent annual meeting of stockholders of the Company occurring prior to the Termination Date (as defined below). The Company has agreed to not increase the size of the Board above nine directors prior to the Termination Date unless the increase is approved by at least seven directors. Mr. Wagenhals will continue to serve as a director and Chairman of the Board.

Unless otherwise mutually agreed to in writing by each party, the Settlement Agreement will remain in effect until the date that is the earlier of (i) 30 days prior to the earlier of (A) the deadline set forth in the notice requirements of Federal "Universal Proxy Rules" promulgated under Rule 14a-19(a) and Rule 14a-19(b) under the Securities Exchange Act of 1934, as amended (the "UPR Deadline") relating to the Company's 2023 annual meeting of stockholders (the "2023 Annual Meeting") and (B) any deadline that may be set forth in the Company's Amended and Restated Certificate of Incorporation (as amended from time to time, the "Certificate") or Bylaws (the "Bylaws") following the execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2023 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2022 Annual Meeting (such date, the "Termination Date"). However, if the Company notifies Mr. Urvan in writing at least 15 days prior to such Termination Date that the Board irrevocably offers to re-nominate the Urvan Group Directors for election at the 2023 Annual Meeting and Mr. Urvan accepts such offer within 15 days of receipt of such notice, the Termination Date will be automatically extended until the earlier of (i) 30 days prior to the earlier of (A) the UPR Deadline relating to the Company's 2024 annual meeting of stockholders (the "2024 Annual Meeting") and (B) any deadline that may be set forth in the Certificate or the Bylaws following execution of the Settlement Agreement relating to the nomination of director candidates for election to the Board at the 2024 Annual Meeting, and (ii) 90 days prior to the first anniversary of the 2023 Annual Meeting. Notwithstanding the foregoing, the "Termination Date" shall not occur prior to 20 days after Mr. Urvan's departure from the Board.

Pursuant to the Settlement Agreement, the Company will suspend the previously announced separation of Company into Action Outdoor Sports, Inc. and Outdoor Online, Inc., pending the further evaluation of strategic options by the Board. The Company paid approximately $500,000 of the Urvan Group's costs, fees and expenses per the terms of the Settlement Agreement. Additionally, the Company issued 125,000 shares of Common

Stock for a total value of $437,500 to an employee and issued 110,000 shares of Common Stock for a total value of $385,000 to an independent contractor as a result of termination without cause per the terms of the Settlement Agreement.

The foregoing summary of the Settlement Agreement does not purport to be complete and is subject to, and qualified in its entirety, by reference to the full text of the Settlement Agreement, a copy of which was previously filed as Exhibit 10.1 in the Form 8-K filed with the SEC on November 7, 2022, and incorporated herein by reference.

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors 141,419 shares of our common stock for a total value of $494,967 in addition to the issuances described in the foregoing paragraphs. We issued 45,000 shares in the aggregate to its advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was
$182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $139,164 included in our Accounts Receivable at March 31, 2022 as a result of this relationship.

* * *

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $2.0 million in inventory support services, and $170,355 of rent expenses for the year ended March 31, 2023. Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022. For the year

ended March 31, 2021, the Company purchased approximately $3.4 million in inventory support services, and incurred $405,171 of rent expenses for the year ended March 31, 2021.

\* \* \*

The Company's balance of Amended Note B was $180,850 and $865,771 at March 31, 2023 and 2022, respectively. The Company recognized $48,665, $110,518, and $60,100 in interest expense on Amended Note B for the years ended March 31, 2023, 2022, and 2021, respectively.

39.    On July 31, 2023, AMMO filed an amendment to its annual report for the fiscal year ended March 31, 2023, on a Form 10-K/A with the SEC (the "Amended 2023 Annual Report"), signed by Defendants Smith and Wiley. The Amended 2023 Annual Report was filed to, *inter alia*, amend and restate disclosure of the Company's directors, executive officers and corporate governance, executive compensation, and certain relationships and related transactions. The Amended 2023 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals.  Specifically, the Amended 2023 Annual Report stated in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

| Name and Principal Position | Year | Salary (1) | Bonus (1) | Stock Awards (2) | All other compensation (3) | Total |
|---|---|---|---|---|---|---|
| Fred W. Wagenhals (4) Chief Executive Officer, and Director | 2023 | $ 475,000 | $ 478,636 | $ 840,000 | $ 24,062 | $1,817,698 |
| | 2022 | $ 298,750 | $ 572,463 | $ 481,250 | $ 0 | $1,352,463 |
| | 2021 | $ 240,000 | $ 96,004 | $ 157,500 | $ 0 | $ 493,504 |
| Robert D. Wiley Chief Financial Officer | 2023 | $ 240,000 | $ 0 | $ 350,000 | $ 15,084 | $ 605,084 |
| | 2022 | $ 217,083 | $ 0 | $ 350,000 | $ 0 | $ 567,083 |
| | 2021 | $ 127,500 | $ 0 | $ 90,977 | $ 0 | $ 218,477 |
| Jared R. Smith (5) President and Chief Operating Officer | 2023 | $ 118,750 | $ 118,750 | $ 175,000 | $ 29,086 | $ 441,586 |
| Robert J. Goodmanson (6) President | 2023 | $ 180,000 | 0 | $ 446,250 | $ 84,973 | 711,223 |
| | 2022 | $ 240,000 | $ 0 | $ 595,000 | $ 0 | $ 835,000 |
| Steve Hilko Chief Operating Officer (7) | 2021 | $ 163,542 | $ 0 | $ 58,333 | $ 0 | $ 221,875 |

**Director Compensation**

| Name | Fees Earned or Paid In Cash (1) | Stock Awards (2) | Option Awards | Nonequity incentive plan compensation | Change in Pension Value and Nonqualified deferred compensation earnings | All other compensation (3) | Total |
|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ 0 | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Harry Markley | $ 0 | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Jessica M. Lockett | $ 48,000 | $ 140,000 | $ - | $ - | $ - | $ - | $ 188,000 |
| Richard R. Childress | $ - | $ 140,000 | $ - | $ - | $ - | $ - | $ 140,000 |
| Steve Urvan (3) | $ 183,692 | $ 140,000 | $ - | $ - | $ - | $ 15,561 | $ 339,253 |
| Wayne Walker (4) | $ - | $ 17,500 | $ - | $ - | $ - | $ - | $ 17,500 |
| Christos Tsentas (4) | $ - | $ 17,500 | $ - | $ - | $ - | $ - | $ 17,500 |
| Randy E. Luth (5) | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

40.     The Amended 2023 Annual Report reported the following regarding certain related transactions which the Company engaged in, excluding those previously reported disclosures, stating in relevant part:

The following is a description of each transaction since April 1, 2022 and each currently proposed transaction in which:

- we have been or are to be a participant;
- the amount involved exceeds $120,000; and
- any related person had or will have a direct or indirect material interest.

*While the Company does not current have a written policy regarding approval of transactions between the Company and a related party, our Board of Directors, as matter of appropriate corporate governance, reviews and approves all such transactions, to the extent required by applicable rules and regulations.* Generally, management would present to the Board of Directors for approval at the next regularly scheduled Board of Directors meeting any related party transactions proposed to be entered into by us. *The Board of Directors may approve the transaction if it is deemed to be in the best interests of our shareholders and the Company.*

\* \* \*

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967. We issued 45,000 shares in the aggregate to our advisory committee members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created with Mr. Urvan by ownership of entities that transacts with Gemini. We

recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

41.    On June 13, 2024, AMMO submitted its annual report for the fiscal year ended March 31, 2024, on a Form 10-K filed with the SEC (the "2024 Annual Report"), signed by Defendants Smith, Wiley, Wagenhals, Wallace, Childress, Lockett, Urvan, Walker, Tsentas, and Luth. The 2024 Annual Report reported the Company's purported financial results, including the Company's financing activities, and the cost of certain payments related to such offerings. Specifically, the 2024 Annual Report stated in relevant part:

| | For the Year Ended | |
| --- | --- | --- |
| | March 31, 2024 | March 31, 2023 |
| Net Revenues | $ 145,054,572 | $ 191,439,801 |
| Cost of Revenues | 102,431,803 | 136,031,204 |
| Gross Margin | 42,622,769 | 55,408,597 |
| Sales, general & administrative expenses | 61,199,966 | 58,667,516 |
| Income (loss) from Operations | (18,577,197) | (3,258,919) |
| Other income (expense) | | |
| Other income (expense) | (779,066) | (606,881) |
| Income (loss) before provision for income taxes | $ (19,356,263) | $ (3,865,800) |
| Provision for income taxes | (3,791,063) | 730,238 |
| Net Income (Loss) | $ (15,565,200) | $ (4,596,038) |

***Financing Activities***

During the year ended March 31, 2024, net cash used in financing activities was $8.7 million, consisting of $3.2 million of insurance premium note payments, $3.0 million of preferred stock dividends paid, $2.2 million used to repurchase shares of Common Stock pursuant to our repurchase plan, and $0.2 million in payments of our related party note payable. These items were offset by $0.1 million of proceeds from warrants exercised for common stock. Additionally, $37.3 million was generated from accounts receivable factoring, which was offset by payments of $37.3 million.

During the year ended March 31, 2023, net cash used in financing activities was $6.7 million, consisting of $3.0 million of preferred stock dividends paid, $2.1 million of insurance premium note payments, an $0.8 million reduction in our Inventory Credit Facility, and $0.7 million in payments of our related party note payable. These items were offset by $1.0 million generated from our construction note payable and $0.1 million of proceeds from warrants exercised for common stock. Additionally, approximately

$71.3 million was generated from accounts receivable factoring, which was offset by payments of approximately $72.3 million.

42.    The 2024 Annual Report asserted the Company did not have any off-balance sheet arrangements, stating in relevant part:

**Off-Balance Sheet Arrangements**

As of March 31, 2024, ***we did not have any off-balance sheet arrangements*** that have or are reasonably likely to have a current or future material effect on our financial condition, net sales, expenses, results of operations, liquidity capital expenditures, or capital resources.

43.    The 2024 Annual Report purported to disclose the Company's related party transactions, excluding those previously reported disclosures, stating in relevant part:

**NOTE 17 – RELATED PARTY TRANSACTIONS**

During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors consisting of a $244,640 payment due upon termination without cause. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which consisted of an issuance of 134,240 shares due upon termination without cause. We issued 25,000 shares in the aggregate to our advisory committee members for service for a total value of $53,250. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 as a result of this relationship. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

On July 24, 2023, Fred Wagenhals departed as CEO and the Board appointed Mr. Wagenhals the Company's Executive Chairman. Mr. Wagenhals remains a member of the Board. Mr. Wagenhals received the following payments in connection with his transition from CEO to Executive Chairman: (i) total cash payments of $1,060,290; (ii) 300,000 shares of Common Stock for a total value of $624,000.

On July 26, 2023, we obtained a $1.6 million letter of credit with Northern Trust for collateral for a bond related to a judgement assessed to GunBroker. On July 17, 2023, we generated a $1.6 million certificate of deposit with Northern Trust for security on the letter of credit. The term of the certificate of deposit is twelve months and includes interest of approximately 5%. Per the terms of the Merger Agreement, filed with the Commission on a Current

Report on Form 8-K on May 6, 2021 (the "Current Report"), the Seller is required to pay or be liable for these losses (capitalized terms are defined the Current Report).

In July of 2023, the Company filed suit in the Delaware Chancery Court against Director and Shareholder Steve Urvan for claims arising out of the Company's acquisition of certain companies referenced as the GunBroker family of companies. The claims arise based upon Mr. Urvan's repeated failure and refusal to honor contractual defense and indemnification obligations arising under that certain Merger Agreement, along with alleged misrepresentations.

\* \* \*

During the year ended March 31, 2023, we paid $551,916 in service fees to two independent contractors of which $223,333 were created as a result of termination without cause as a result of our Proxy Settlement Agreement. The two independent contractors were issued 141,419 shares of our common stock for a total value of $494,967 in addition to the issuances described in the foregoing paragraphs. We issued 45,000 shares in the aggregate to its advisory committee Members for service for a total value of $129,750. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of entities that transacts with Gemini. We recognized $215,300 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $182,344 included in our Accounts Receivable at March 31, 2023 as a result of this relationship.

During the year ended March 31, 2022, we paid $229,083 in service fees to an independent contractor and we issued 60,000 shares in the aggregate to its advisory committee members for service for a total value of $173,000. Through our acquisition of Gemini, a related party relationship was created through one of our Members of the Board of Directors by ownership of an entity that transacts with Gemini. We recognized $1,042,277 in Marketplace Revenue for the year ended March 31, 2022 that was attributable to that relationship. There was $139,164 included in our Accounts Receivable at March 31, 2022 as a result of this relationship.

\* \* \*

Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased approximately incurred $2.0 million in inventory support services, and $170,355 of rent expenses for the year ended March 31, 2023. Through the Administrative and Management Services Agreement the Company with JSC, the Company purchased

- 25 -

approximately $1.7 million in inventory support services, and $408,852 of rent expenses for the year ended March 31, 2022.

* * *

The Company paid off the balance of Amended Note B during the year ended March 31, 2024. The Company's balance of Amended Note B was $180,850 and $865,771 at March 31, 2023 and 2022, respectively. The Company recognized $1,788, $48,665, $110,518, and $60,100 in interest expense on Amended Note B for the years ended March 31, 2024, 2023, and 2022, respectively.

44.    On July 29, 2024, AMMO filed an amendment to its annual report for the fiscal year ended March 31, 2024, on a Form 10-K/A with the SEC (the "Amended 2024 Annual Report"). The Amended 2024 Annual Report was filed to, *inter alia*, amend and restate disclosure of the Company's directors, executive officers and corporate governance, executive compensation, and certain relationships and related transactions. The Amended 2024 Annual Report reported the composition and compensation of the Company's executive officers and directors, as well as the valuation of the Company's stock awards made to such individuals.   Specifically, the Amended 2024 Annual Report stated in relevant part:

**ITEM 11 EXECUTIVE COMPENSATION**

| Name and principal position | Year | Salary ($)(1) | Bonus ($)(1) | Stock awards ($)(2) | Option awards ($)(3) | All other compensation (4) | Total |
|---|---|---|---|---|---|---|---|
| Jared R. Smith (6) CEO, and Director | 2024 | $ 492,215 | $ - | $ 425,800 | $ 430,457 | $ 33,943 | $ 1,382,415 |
| | 2023 | $ 118,750 | $ 118,750 | $ 175,000 | $ - | $ 29,086 | $ 441,586 |
| Robert D. Wiley CFO | 2024 | $ 310,833 | $ 129,000 | $ 225,000 | $ - | $ 14,567 | $ 679,400 |
| | 2023 | $ 240,000 | $ - | $ 350,000 | $ - | $ 15,084 | $ 605,084 |
| | 2022 | $ 217,083 | $ - | $ 350,000 | $ - | $ - | $ 567,083 |
| Fred W. Wagenhals (5)(7) Chairman of the Board of Directors, Executive Chair | 2024 | $ 423,270 | $ 85,438 | $ 1,129,650 | $ - | $ 1,079,508 | $ 2,717,866 |
| | 2023 | $ 475,000 | $ 478,636 | $ 840,000 | $ - | $ 24,062 | $ 1,817,698 |
| | 2022 | $ 298,750 | $ 572,463 | $ 481,250 | $ - | $ - | $ 1,352,463 |
| Anthony Tate Vice President of Sales & Marketing | 2024 | $ 246,566 | $ 62,000 | $ 206,250 | $ - | $ - | $ 514,816 |
| Beth Cross Chief Operating Officer, GunBroker | 2024 | $ 250,000 | $ 62,000 | $ 168,750 | $ - | $ 25,979 | $ 506,729 |
| Tod Wagenhals Executive Vice President, Secretary | 2024 | $ 230,000 | $ - | $ 203,000 | $ - | $ 18,517 | $ 451,517 |

**Director Compensation**

| Name and Principal Position | Fees earned or paid in cash ($)(1) | | Stock awards ($)(2)(3) | | Option awards ($) | | Total ($) | |
|---|---|---|---|---|---|---|---|---|
| Russell William Wallace Jr. | $ | - | $ | 90,000 | $ | - | $ | 90,000 |
| Jessica M. Lockett (5) | $ | 48,000 | $ | 90,000 | $ | - | $ | 138,000 |
| Richard R. Childress | $ | - | $ | 90,000 | $ | - | $ | 90,000 |
| Steve Urvan | $ | - | $ | 90,000 | $ | - | $ | 90,000 |
| Wayne Walker | $ | - | $ | 101,351 | $ | - | $ | 101,351 |
| Christos Tsentas | $ | - | $ | 101,351 | $ | - | $ | 101,351 |
| Randy E. Luth | $ | - | $ | 109,875 | $ | - | $ | 109,875 |
| Harry S. Markley(4) | $ | - | $ | 26,725 | $ | - | $ | 26,725 |

45.     The Amended 2024 Annual Report reported the following regarding certain related transactions which the Company engaged in, in relevant part:

**Related Party Transactions**

Our Related Party Transactions Policy provides guidance for addressing actual or potential conflicts of interests, including those that may arise from transactions and relationships between us and our executive officers or directors. The Audit Committee and Board, as matter of appropriate corporate governance, reviews and approves all such transactions, to the extent required by applicable rules and regulations. Generally, management would present to the Board for approval at the next regularly scheduled Board meeting any related party transactions proposed to be entered into by us. The Audit Committee and Board may approve the transaction if it is deemed to be in the best interests of the Company

The following is a description of each transaction since April 1, 2023 and each currently proposed transaction in which:

- we have been or are to be a participant;

- the amount involved exceeds $120,000; and

- any related person had or will have a direct or indirect material interest.

During the year ended March 31, 2024, we paid $410,173 in service fees to two independent contractors, who provided services to the company, which included a $244,640 payment due upon termination without cause to one of the independent contractors. The two independent contractors were issued 168,581 shares of Common Stock for a total value of $350,345, which included an issuance of 134,240 shares due upon termination without cause for one of the independent contractors. We issued 25,000 shares in the

aggregate to our advisory committee members for service for a total value of $53,250.

Through our acquisition of Gemini Direct Investments, LLC ("Gemini"), a related party relationship was created through one of our directors, Mr. Steve Urvan, by his ownership of entities that provided services to Gemini. There was $201,646 included in our Accounts Receivable at March 31, 2024 from entities owned by Mr. Urvan.

The Company paid off the balance of a promissory note to Jagemann Stamping Company ("JSC") during the year ended March 31, 2024. JSC became a shareholder of the Company through the Company's acquisition of JSC's brass casing division. The payment made to JSC during fiscal 2024 consisted of $181,132 in principal and $2,784 in interest on the note. Additionally, we owed $150,866 to Jagemann Precision Tooling, a division of JSC, at March 31, 2024.

46.    The above-referenced statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose to investors: (i) that the Company lacked adequate internal controls over financial reporting; (ii) that there was a substantial likelihood the Company failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) that there was a substantial likelihood the Company failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

47.    On September 24, 2024, after the market closed, AMMO announced that its Chief Financial Officer had resigned "at the request of the Board." Further, the Company disclosed that it is conducting an independent investigation into its "internal control over

financial reporting for the fiscal years 2020 through 2023." Specifically, on that date, the Company filed a form 8-K with the SEC which stated, in relevant part:

### Resignation of Mr. Rob Wiley as Chief Financial Officer

On September 19, 2024, the Company received a notice of resignation from its Chief Financial Officer, Rob Wiley, effective September 20, 2024. **Mr. Wiley resigned upon request by the Board.** Pursuant to a recommendation by the Compensation Committee, the Board exercised its discretion to approve a separation agreement ("Separation Agreement") for Mr. Wiley. Mr. Wiley signed the Separation Agreement on September 19, 2024. Pursuant to the Separation Agreement, Mr. Wiley will be entitled to separation compensation in the amount of $406,250.00 paid in equal bi-monthly installments over fifteen calendar months; fifty thousand shares of common stock; a lump sum payment for accrued and unused vacation and paid time off; family health benefits under the Company's employer sponsored plans until September 30, 2025; and unreimbursed expenses. Mr. Wiley gave the Company a general liability release, and the Parties agreed to several standard restrictive covenants. Additionally, the Separation Agreement requires Mr. Wiley to provide cooperation and assistance to the Company to facilitate the transfer of duties to his successor.

### Independent Investigation

*A Special Committee of the Board of Directors has retained a law firm to conduct an independent investigation, focused on fiscal years 2020 through 2023, including determining whether the Company and its management control persons at the time: (i) accurately disclosed all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (ii) properly characterized certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; and (iii) appropriately valued unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022*. The Company's outside auditors have indicated that *they are not prepared to rely on representations from the Company's management team from the period in question* until such time that the aforementioned investigation and all appropriate remediation, if necessary, is completed. This independent investigation is in its early stages, and to ensure the fairness of that process, the Company does not plan further comment pending completion of the investigation.

48.     On this news, the Company's share price fell $0.08, or 5.26%, to close at $1.44 per share on September 25, 2024, on unusually heavy trading volume.

1

## DAMAGE TO THE COMPANY

2

**Securities Class Action**

3    49.    On September 27, 2024, a securities class action complaint was filed in the
4  United States District Court for the District of Arizona against the Company and
5  Defendants Wagenhals, Smith, and Wiley. The complaint alleges violations of Sections
6  10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC
7  Rule 10b-5, in the case captioned: *Larmay v. Ammo, Inc., et al.*, Case No. 2:24-cv-02619-
8  JFM (D. Ariz.) (the "Securities Class Action").

9    50.    As a result of the wrongs complained of herein, the Individual Defendants
10  have subjected the Company to the significant cost of defending itself and certain of the
11  Company's officers.  The Company will continue to incur significant sums in relation to
12  the Securities Class Action and any liability or settlement that results.

13

**Share Repurchases**

14    51.    On February 8, 2022, the Company's Board of Directors authorized a share
15  repurchase program for up to $30 million.  On March 28, 2023, the Company announced
16  that the Director Defendants authorized the extension of the repurchase program until
17  February 2024. On February 8, 2024, the Company further announced that the Director
18  Defendants authorized the extension of the repurchase program until February 2025

19    52.    Pursuant to this share repurchase program, the Individual Defendants caused
20  the Company to repurchase its own common stock at artificially inflated prices, as follows:

21

22

| Month | Units | Share Price ($) | Total Cost ($) | Harm to the Company ($)[3] |
|---|---|---|---|---|
| December 2022 | 150,000 | 1.92 | 288,000 | 72,000 |
| March 2023 | 118,328 | 1.93 | 228,373 | 57,981 |
| April 2023 | 609,509 | 1.95 | 1,188,543 | 310,850 |

25

[3]    "Harm to the Company" refers to how much the Company overpaid for its
own common stock by repurchasing it at artificially inflated prices and is calculated
by subtracting what the Company should have paid for its stock (at $1.44 per share,
as it was when the truth was revealed) from the "Total Cost," *i.e.*, what the Company
actually paid for its common stock.

| | | | | |
|---|---|---|---|---|
| May 2023 | 129,322 | 1.95 | 252,178 | 65,954 |
| August 2023 | 158,542 | 1.99 | 315,499 | 87,198 |
| September 2023 | 39,256 | 2.00 | 78,512 | 21,983 |
| November 2023 | 11,000 | 2.00 | 22,000 | 6,160 |
| December 2023 | 134,483 | 2.02 | 271,656 | 78,000 |
| June 2024 | 579,463 | 1.89 | 1,095,185 | 260,758 |
| **TOTAL** | **1,929,903** | **--** | **3,739,945** | **$960,884** |

53.    The Individual Defendants, while in positions of control and influence and in possession of material non-public information, caused the Company to repurchase its own common stock at artificially inflated prices, which caused the Company to overpay for its own common stock by approximately $960,884.

**Unjust Compensation**

54.    At all relevant times, the Company paid lucrative compensation to each of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

55.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *infra*, for which they were compensated for.

56.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Additional Damage to the Company**

57.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers,

accountants, and investigators in connection thereto.

58.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

59.    The Company has also suffered, and will continue to suffer, a loss of reputation as a direct and proximate result of the Individual Defendants' misconduct which will plague the Company's share price going forward.

## CORPORATE GOVERNANCE

60.    At all relevant times, the Company had in place corporate governance documents imposing duties and responsibilities on its directors and officers, and additional duties on the Company's committee members. Accordingly, each of the Individual Defendants were required to comply with the corporate governance documents, as detailed below.[4]

61.    Despite the following corporate governance, the conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

**Code of Conduct**

62.    The Company has in place a Code of Conduct which "sets out basic principles to guide the directors, officers, and employees of AMMO, Inc." The Code of Conduct states that:

> All Company directors, officers, and employees should conduct themselves accordingly and seek to avoid even the appearance of improper behavior in

---

[4]    Many of the corporate governance documents on the Company's Investor Relations website, including the Code of Conduct, Code of Ethics, and Audit Committee Charter are "effective June 6, 2024."  Upon information and belief, substantially similar corporate governance documents existed and were in effect through the Relevant Period.

any way relating to the Company.  As a public company, we have a responsibility to ensure that our filings with the Securities and Exchange Commission ("SEC") and other public communications are timely and accurate. Accordingly, we expect our directors, officers, and other employees to take this responsibility seriously and act in accordance with the highest standards of personal and professional integrity in all aspects of their work. In appropriate circumstances, this Code should also be provided to and followed by the Company's agents and representatives, including consultants.

63.    From the outset, the Code of Conduct makes clear that:

This Code is intended to deter wrongdoing and to promote the following:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely, and understandable disclosure in reports and documents AMMO files with, or submits to, the SEC and in other communications made by the Company;

- compliance with applicable governmental laws, rules, and regulations;

- the prompt internal reporting of violations of this Code to the appropriate person or persons identified in this Code;

- accountability for adherence to this Code; and

- adherence to a high standard of business ethics.

64.    In a section entitled "Compliance with Laws, Rules, and Regulations," the Code of Conduct states:

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All directors, officers, and employees should respect and obey all laws, rules, and regulations applicable to the business and operations of the Company. Although directors, officers, and employees are not expected to know all of the details of these laws, rules, and regulations, it is important to know enough to determine when to seek advice from managers, supervisors, officers, legal, or other appropriate Company personnel.

65.     In a section entitled "Conflicts of Interest," the Code of Conduct states, in relevant part:

> A "conflict of interest" exists when an individual's private interest interferes in any way – or even appears to conflict - with the interests of the Company. A conflict of interest situation can arise when a director, officer, or employee takes actions or has interests that may make it difficult to perform his or her work on behalf of the Company in an objective and effective manner. Conflicts of interest may also arise when a director, officer, or employee, or a member of his or her family receives improper personal benefits as a result of his or her position with the Company. Loans to, or guarantees of obligations of, employees and their family members may create conflicts of interest.

> Service to the Company should never be subordinated to personal gain or advantage. Conflicts of interest, whenever possible, should be avoided.

> * * *

> Conflicts of interest are prohibited as a matter of Company policy.

66.     In a section entitled "Record-Keeping," the Code of Conduct states:

> All of the Company's books, records, accounts, and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions, and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

> Business records and communications often become public, and the Company and its officers and employees in their capacity with the Company should avoid exaggeration, derogatory remarks, guesswork, or inappropriate characterizations of people and companies that can be misunderstood. This applies equally to e-mail, internal memos, and formal reports.

67.     In a section entitled "Communications with the Public and the Media," the Code of Conduct states:

> The Company's communications with or disseminated to the investing public must be honest and straightforward. Ethical behavior is a core value of the Company. To ensure that the Company's communications are always accurate and consistent, a limited number of individuals within the Company

(including AMMO's Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer) are responsible for communication on the Company's behalf. Only those individuals with authority to speak publicly on the Company's behalf with respect to matters that could impact the trading of AMMO stock may do so. If an employee does not have this authority and is approached by a member of the public or the media, the employee should refer them to the Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, or legal counsel of AMMO as quickly as possible.

68.    Regarding "Corporate Disclosures," the Code of Conduct makes clear:

All directors, officers, and employees should support the Company's goal to have full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by AMMO with the SEC. Although most employees hold positions that are far removed from AMMO's required filings with the SEC, each director, officer, and employee should promptly bring to the attention of the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the legal counsel, or the Audit Committee of AMMO, as appropriate in the circumstances, any of the following:

- Any material information to which such individual may become aware that affects the disclosures made by AMMO in its public filings or would otherwise assist the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the legal counsel, and the Audit Committee of AMMO in fulfilling their responsibilities with respect to such public filings.

- Any information the individual may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

- Any information the individual may have concerning any violation of this Code, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

- Any information the individual may have concerning evidence of a material violation of the securities or other laws, rules, or regulations

applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of this Code.

69.    Finally, the Code of Conduct promotes the "Reporting [of] any Illegal or Unethical Behavior," stating in relevant part:

> Directors and officers are encouraged to talk to the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, or the legal counsel of AMMO, and employees are encouraged to talk to managers, supervisors, Human Resources, or other appropriate personnel, when in doubt about the best course of action in a particular situation. Directors, officers, and employees should report any observed illegal or unethical behavior and any perceived violations of laws, rules, regulations, or this Code to the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the legal counsel, or Human Relations Department of AMMO, as appropriate. It is the policy of the Company not to allow retaliation for reports of misconduct by others made in good faith. Directors, officers, and employees are expected to cooperate in internal investigations of misconduct.

> The Company maintains a Whistleblower Policy, for (1) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (2) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters.

**Code of Ethics**

70.    The Company maintains a Code of Ethics which is applicable to the CEO, CFO, principal accounting officer, and all other senior financial officers.

71.    The Code of Ethics, in addition to the Code of Conduct, imposes the following additional duties and responsibilities on the CEO, CFO, principal accounting officer, and all other senior financial officers:

> 1.    The Chief Executive Officer and all Senior Financial Officers are responsible for full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the Company with the SEC. Accordingly, it is the responsibility of the Chief Executive Officer and each Senior Financial Officer promptly to bring to the attention of the Disclosure Committee, if applicable, and to the Audit Committee any material information of which he or she may become aware that affects the disclosures

made by the Company in its public filings or otherwise assist the Disclosure Committee, if applicable, and the Audit Committee in fulfilling their responsibilities.

2.      The Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Committee, if applicable, and the Audit Committee any information he or she may have concerning (a) significant deficiencies in the design or operation of internal controls that could adversely affect the Company's ability to record, process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

3.      The Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Audit Committee any information he or she may have concerning any violation of this Code or the Company's Code of Conduct, including any actual or apparent conflicts of interest between personal and professional relationships, involving any management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

4.      The Chief Executive Officer and each Senior Financial Officer shall promptly bring to the attention of the Disclosure Committee, if applicable, and the Audit Committee any information he or she may have concerning evidence of a material violation of the securities or other laws, rules, or regulations applicable to the Company and the operation of its business, by the Company or any agent thereof, or of violation of the Code of Conduct or of these additional procedures.

5.      The Board of Directors shall determine, or designate appropriate persons to determine, appropriate actions to be taken in the event of violations of the Code of Conduct or of these additional procedures by the Chief Executive Officer and the Company's Senior Financial Officers. Such actions shall be reasonably designed to deter wrong doing and to promote accountability for adherence to the Code of Conduct and to these additional procedures, and may include written notices to the individual involved that the Board has determined that there has been a violation, censure by the Board, demotion or re-assignment of the individual involved, suspension with or without pay or benefits (as determined by the Board), and termination of the individual's employment. In determining the appropriate action in a particular case, the Board of Directors or such designee shall take into account all relevant information, including the nature and severity of the violation, whether the violation was a single occurrence or repeated occurrences, whether the violation appears to have been intentional or inadvertent, whether the individual in question had been advised prior to the

violation as to the proper course of action, and whether or not the individual in question had committed other violations in the past.

**Audit Committee Charter**

72.    The Company maintains an Audit Committee Charter which sets forth the additional duties and responsibilities of the Audit Committee members. The Audit Committee Charter states that the Audit Committee's role is "to assist the Board in its oversight of the accounting and financial reporting processes of the Company and the Company's compliance with legal and regulatory requirements." To assist the Board in fulfilling its responsibilities, the Audit Committee Charter states that the Audit Committee shall:

1.    Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company.

2.    To provide assistance to the Board with respect to its oversight of the following:

a.  The integrity of the Company's financial statements;

b.  The Company's compliance with legal and regulatory requirements;

c.  The Company's processes relating to risk management, the conduct and systems of internal control over financial reporting, and disclosure controls and procedures;

d.  The independent auditor's engagement, qualifications, compensation, and independence;

e.  The performance of the Company's internal audit function, if any, and independent auditor.

3.    To prepare the report that the Securities and Exchange Commission (the "SEC") rules require be included in the Company's annual proxy statement.

73.    In a section entitled "Authority," the Audit Committee Charter states, in relevant part:

- 38 -

In discharging its role, the Committee is empowered to inquire into any matter that it considers appropriate to carry out its responsibilities, with access to all books, records, facilities and personnel of the Company, and, subject to the direction of the Board, the Committee is authorized and delegated the authority to act on behalf of the Board with respect to any matter it determines to be necessary or appropriate to the accomplishment of its purposes.

The Committee shall have authority to retain, direct and oversee the activities of, and to terminate the engagement of, the Company's independent auditor and any other accounting firm retained by the Committee to prepare or issue any other audit report or to perform any other audit, review or attest services and any legal counsel, accounting or other advisor or consultant hired to assist the Committee, all of whom shall be accountable to the Committee.

74.    In a section entitled "Duties and Responsibilities," the Audit Committee Charter states, in relevant part:

The Committee shall carry out the duties and responsibilities set forth below. These functions should serve as a guide with the understanding that the Committee may determine to carry out additional functions and adopt additional policies and procedures as may be appropriate in light of changing business, legislative, regulatory, legal, or other conditions. The Committee shall also carry out any other duties and responsibilities delegated to it by the Board of Directors from time to time related to the purposes of the Committee outlined in this Charter. The Committee may perform any functions it deems appropriate under applicable law, rules, or regulations, the Company's by-laws, and the resolutions or other directives of the Board, including review of any certification required to be reviewed in accordance with applicable law or regulations of the SEC.

In discharging its oversight role, the Committee is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate. In this regard and as it otherwise deems appropriate, the Committee shall have the authority, without seeking Board approval, to engage and obtain advice and assistance from outside legal and other advisors as it deems necessary to carry out its duties. The Committee also shall have the authority to receive appropriate funding, as determined by the Committee, in its capacity as a committee of the Board of Directors, from the Company for the payment of compensation to any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review, or attest services for the Company; to compensate any outside legal or other advisors engaged by the Committee; and to pay the ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

- 39 -

The Committee shall be given full access to the Company's internal audit group, if any, Board of Directors, corporate executives, and independent auditor as necessary to carry out these responsibilities. While acting within the scope of its stated purpose, the Committee shall have all the authority of the Board of Directors, except as otherwise limited by applicable law.

Notwithstanding the foregoing, the Committee is not responsible for certifying the Company's financial statements are complete and accurate and in accordance with U.S Generally Accepted Accounting Principles ("U.S GAAP") or guaranteeing the independent auditor's report. The fundamental responsibility for the Company's financial statements and disclosures rests with management and the independent auditor. It also is the job of the Chief Executive Officer and senior management, rather than that of the Committee, to assess and manage the Company's exposure to risk.

*Documents/Reports Review*

[] Discuss with management and the independent auditor, prior to public dissemination, the Company's annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss with the independent auditor the matters required to be discussed by Statement of Auditing Standards No. 61 and such other matters required pursuant to the requirements of the Public Company Oversight Board ("PCAOB").

[] Discuss with management and the independent auditor the Company's earnings press releases (paying particular attention to the use of any "proforma" or "adjusted" non-GAAP information), as well as financial information and earnings guidance provided and the type of presentations made to analysts and rating agencies.

[] Discuss with management and the independent auditor the Company's major financial risk exposures, the guidelines and policies by which risk assessment and management is undertaken, and the steps management has taken to monitor and control risk exposure.

* * *

*Financial Reporting Process*

[] Review periodically the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company.

[] Advise management, the internal audit department, and the independent auditor that they are expected to provide the Committee a timely analysis of any significant financial reporting issues and practices.

[] Obtain from the independent auditor assurance that the audit of the Company's financial statements was conducted in a manner consistent with Section 10A of the Securities Act, which sets forth procedures to be followed in any audit of financial statements required under the Securities Act.

## DUTIES OF THE DIRECTOR DEFENDANTS

75.    As members of the Company's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

76.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company

77.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

78.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future

business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

79.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)    conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)    remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)    ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

80. Each Director Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

81. The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, gross mismanagement, and other wrongful conduct as alleged herein.

83. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

84. Plaintiff is a current owner of the Company's stock and has continuously been an owner of Company's stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

85. Because of the facts set forth herein, Plaintiff has not made a demand on the Board to institute this action against the Individual Defendants. Such a demand would be

a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

86.    The Company's Board is currently comprised of nine (9) members including Defendants Wagenhals, Smith, Childress, Lockett, Urvan, Tsentas, Walker, and Luth. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

87.    Each of the Director Defendants face a likelihood of liability in this action because they caused and/or permitted the Company to make false and misleading statements and omissions concerning the information described herein.  Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, non-public information regarding the Company and were directly involved in the operations of the Company at the highest levels.

88.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

89.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

90.    Each of the Director Defendants, by virtue of their roles, were required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated

in a diligent, honest, and prudent manner. Despite this, the Director Defendants failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

91. As trusted Company directors, the Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets.

92. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

93. Each of the Director Defendants reviewed, authorized, signed, and thus personally made and/or otherwise permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

94. Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

95. Despite having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed to seek recovery for AMMO for any of the misconduct alleged herein.

///

///

///

## THE DIRECTOR DEFENDANTS ARE
## <u>NOT INDEPENDENT OR DISINTERESTED</u>

**Defendant Wagenhals**

96.     Defendant Wagenhals is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its Executive Chairman) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Wagenhals cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

97.     As Executive Chairman, Defendant Wagenhals also fails the NASDAQ bright-line independence test as set forth in NASDAQ Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Wagenhals could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Wagenhals is therefore futile.

98.     Defendant Wagenhals also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Wagenhals is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

99.     In addition, Defendant Wagenhals receives lucrative compensation in connection with his employment with the Company. Defendant Wagenhals is not independent from Defendants Wayne, Wallace, and Luth as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the Executive Officers, including Defendant Wagenhals. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation

he receives, Defendant Wagenhals could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

100.    Because of Defendant Wagenhals's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Wagenhals is unable to comply with his fiduciary duties and prosecute this action. Defendant Wagenhals is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**<u>Defendant Smith</u>**

101.    Defendant Smith is neither disinterested nor independent and is thus incapable of considering a demand to sue because he (as its CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Smith cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

102.    As CEO, Defendant Smith also fails the NASDAQ bright-line independence test as set forth in NASDAQ Listing Rule 5605(a)(2) and cannot, therefore, be considered independent, as admitted by the Company in its 2023 Proxy Statement. As such, Defendant Smith could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Smith is therefore futile.

103.    Defendant Smith also personally reviewed, signed, authorized, and/or made the false and misleading statements alleged herein during earnings calls, in SEC filings, press releases, and in other public forums. Thus, as a main perpetrator of the wrongdoing alleged herein, Defendant Smith is irreconcilably conflicted, faces a substantial likelihood of liability, and cannot consider a demand to sue.

104.    In addition, Defendant Smith receives lucrative compensation in connection with his employment with the Company. Defendant Smith is not independent from Defendants Wayne, Wallace, and Luth as they comprise the Compensation Committee and

are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Smith. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Smith could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

105.    Because of Defendant Smith's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Smith is unable to comply with his fiduciary duties and prosecute this action. Defendant Smith is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action.

**Defendant Urvan**

106.    Defendant Urvan is neither disinterested nor independent and is thus incapable of considering a demand to sue because he, (as Chief Strategy Officer of GunBroker.com) was an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent, as admitted by the Company in its 2023 Proxy Statement.

107.    As the Company also notes in its 2023 Proxy Statement, "[t]hrough our acquisition of Gemini, a related party relationship was created with Steve Urvan by ownership of entities that transact with Gemini." Accordingly, Defendant Urvan is irreconcilably conflicted and interested, thus demand is futile.

**Defendants Walker and Tsentas**

108.    Defendants Walker and Tsentas are incapable of considering a demand to sue because their nomination to the Company's Board was made as a direct result of a settlement agreement between the Company and Defendant Urvan and are dubbed, along

with Defendant Urvan, the "Urvan Group Directors."[5]  As such, Defendants Walker and Tsentas are indebted to Defendant Urvan and could not consider a demand to sue the Individual Defendants, including Defendant Urvan.

**Defendants Lockett, Wallace, Childress and Tsentas**

109.    During the Relevant Period, Defendants Lockett, Wallace Childress and Tsentas served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein

110.    Defendants Lockett, Wallace Childress and Tsentas breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above. Therefore, Defendants Lockett, Wallace Childress and Tsentas face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Additional Reasons Demand is Futile**

111.    The Director Defendants authorized the harmful share repurchase program which the Individual Defendants took advantage of during the Relevant Period, causing over $980,000 worth of damage to the Company which has been unremedied. The Director Defendants each face a likelihood of liability as a result of these harmful share repurchases and cannot, therefore, consider a demand to sue.

---

[5]    *See* AMMO, Inc. Form 10-K, Exhibit 10.1 (Jun. 14, 2023), available at: https://www.sec.gov/Archives/edgar/data/1015383/000149315222030771/ex10-1.htm

112.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

113.    The Company, at all material times, had its Code of Conduct and related corporate governance policies which required each of the Individual Defendants to maintain the highest standards of honesty and integrity, particularly in relation to accurate and truthful public disclosures. Yet, despite this Code of Conduct and other relevant policies and committee charters, each of the Director Defendants failed to ensure that the Company upheld high standards of integrity, misrepresented facts to the investing public, and failed to report any concerns, or investigate any misconduct, let alone commence litigation against the Individual Defendants.

114.    In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, and unjust enrichment. In violation of the Code of Conduct, the Director Defendants failed to comply with laws and regulations, failed to maintain the accuracy of company records, public reports, and communications, and failed to uphold the responsibilities related thereto. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

115.    The Director Defendants received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board.  They have benefitted from the wrongs alleged herein and have engaged therein to preserve their positions of control and the prerequisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

116.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad

faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

117.    Publicly traded companies, such as AMMO, typically carry director and officer liability insurance from which the Company could potentially recover some or all of its losses.  However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover the Company's damages. If no such insurance is carried, then the Director Defendants will not cause the Company to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event.

118.    Accordingly, each of the Director Defendants, and at least a majority of them, cannot reasonably consider a demand with the requisite disinterestedness and independence. Indeed, any demand upon the Director Defendants is futile and, thus, excused.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**

#### **(Against the Individual Defendants for Breach of Fiduciary Duties)**

119.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

120.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

121.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

122.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to disclose to investors: (i) that the company lacked adequate internal controls over financial reporting; (ii) that there was a substantial likelihood the Company failed to accurately disclose all executive officers, members of management, and potential related party transactions in fiscal years 2020 through 2023; (iii) that there was a substantial likelihood the Company failed to properly characterize certain fees paid for investor relations and legal services as reductions of proceeds from capital raises rather than period expenses in fiscal years 2021 and 2022; (iv) there was a substantial likelihood the Company failed to appropriately value unrestricted stock awards to officers, directors, employees and others in fiscal years 2020 through 2022; and (v) that, as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

123.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

124.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

1

2

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Gross Mismanagement)**

3       125.    Plaintiff incorporates by reference and re-allege each allegation contained

4   above, as though fully set forth herein.

5       126.    By their actions alleged herein, the Individual Defendants, either directly or

6   through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary

7   duties with regard to prudently managing the assets and business of the Company in a

8   manner consistent with the operations of a publicly held corporation.

9       127.    As a direct and proximate result of the Individual Defendants' gross

10  mismanagement and breaches of duty alleged herein, the Company has sustained

11  significant damages in excess of hundreds of millions of dollars.

12      128.    Because of the misconduct and breaches of duty alleged herein, the

13  Individual Defendants are liable to the Company.

14

15

**THIRD CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

16      129.    Plaintiff incorporates by reference and realleges each and every allegation

17  contained above, as though fully set forth herein.

18      130.    The wrongful conduct alleged regarding the issuance of false and misleading

19  statements was continuous, connected, and on-going throughout the Relevant Period.  It

20  resulted in continuous, connected, and ongoing harm to the Company.

21      131.    As a result of the misconduct described above, the Individual Defendants

22  wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to

23  certain of its executive officers; (ii) awarding self-interested stock options to certain

24  officers and directors; (iii) incurring potentially millions of dollars of legal liability and/or

25  legal costs to defend the Officer Defendants' unlawful actions; and (iv) causing the

26  Company to repurchase its own common stock at artificially inflated prices.

27      132.    As a result of the waste of corporate assets, the Individual Defendants are

28  liable to the Company.

- 53 -

**FOURTH CAUSE OF ACTION**

**(Against the Individual Defendants for Unjust Enrichment)**

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and the detriment of, the Company

135.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

136.    Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

**FIFTH CAUSE OF ACTION**

**(Against the Individual Defendants for Aiding and Abetting)**

137.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

138.    The Director Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Officer Defendants. Likewise, the Officer Defendants exploited, aided and abetted, and were knowing and culpable participants to the breaches of fiduciary duty by the Director Defendants.

139.    Specifically, the Director Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Company to engage in the scheme to issue materially false and misleading statements to the public, including in the Company's SEC filings, and by facilitating and disguising the Officer Defendants' violations of law as alleged herein, and failing to report the same.

140.    The Officer Defendants, in violation of the Company's corporate governance, engaged in and/or permitted the Officer Defendants' lack of oversight and scheme to issue materially false and misleading statements to the Company's shareholders to secure, *inter alia*, the re-election of certain Director Defendants, by facilitating and disguising the Director Defendants' violations of law as alleged herein, and failing to report the same.

141.    As a result, the Director Defendants substantially assisted the Officer Defendants, and the Officer Defendants substantially assisted the Director Defendants in breaching their fiduciary duties and in committing the other wrongful and unlawful conduct as alleged herein.

142.    As a direct and proximate result of the aiding and abetting the breaches of fiduciary duty alleged herein, the Company has sustained and will continue to sustain significant damages.

143.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SIXTH CAUSE OF ACTION

**(Against the Individual Defendants for Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 Promulgated Thereunder)**

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    During the Relevant Period, the Individual Defendants disseminated and/or approved public statements that failed to disclose that the above-referenced truthful facts and as a result of the foregoing, the Individual Defendants' public statements were

materially false and misleading at all relevant times. Thus, the price of the Company's shares was artificially inflated due to the deception of the Individual Defendants. Despite this artificial inflation in the price of the Company's shares, the Individual Defendants caused and/or allowed the Company to repurchase many millions of shares of Company stock, thereby causing significant financial harm to the Company.

146.    As alleged herein, the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding AMMO, their control over, and/or receipt and/or modification of AMMO's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning AMMO, participated in the fraudulent scheme alleged herein.

147.    The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

148.    The Individual Defendants were each members of AMMO's Board of Directors and senior management team during the aforesaid time period. Based on their roles at AMMO, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

149.    At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature

and extent of the problems at AMMO, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

150.    Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

151.    As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.    As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

### **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.  Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.  Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties, gross mismanagement, unjust

enrichment, waste of corporate assets, aiding and abetting, and violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder;

C.  Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.  Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  October 29, 2024

**MARTIN & BONNETT, P.L.L.C.**

By:  _/s/ Susan Martin_
     Susan Martin
     Jennifer Kroll
     4647 N. 32nd Street, Suite 185
     Phoenix, AZ 85018
     Tel: (602) 240-6900

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (*pro hac vice* forthcoming)
260 Madison Avenue, 22nd Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
tjmckenna@gme-law.com

***Attorneys for Plaintiff***